EDMUND G. BROWN JR.
Attorney General of California
DANE R. GILLETTE
CHIEF ASSISTANT ATTORNEY GENERAL
GARY W. SCHONS
SENIOR ASSISTANT ATTORNEY GENERAL
ANNIE FRASER
Deputy Attorney General
SCOTT C. TAYLOR
Deputy Attorney General
State Bar No. 137887
  110 West A Street, Suite 1100
San Diego, CA 92101
  P.O. Box 85266
San Diego, CA 92186-5266
Telephone: (619) 645-2605
Fax: (619) 645-2191
E-mail: Scott.Taylor@doj.ca.gov
*Attorneys for Respondent*

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| HORACE EDWARDS KELLY, | ***DEATH PENALTY CASE*** |
|---|---|
| Petitioner, | 93CV2951-TJH |
| v. | Related Cases: 92CV5420-TJH, 98CV2722-TJH, 98CV2723 TJH |
| R.K. WONG, Acting Warden,, | **OPPOSITION TO PETITIONER'S MOTION TO STAY FEDERAL HABEAS CORPUS PROCEEDINGS DUE TO INCOMPETENCE OF PETITIONER** |
| Respondent. | |
| | Judge      The Honorable Terry J. Hatter Jr. |
| | Hearing Date: October 21, 2009: |

1

**TABLE OF CONTENTS**

2

Page

3    Preliminary Statement....................................................................................................1

4    Procedural Background..................................................................................................2

     Argument ........................................................................................................................6

5        I.    Kelly is not entitled to a stay of Federal Habeas proceedings..............6

6            A.    Kelly bears the burden of proof regarding mental
                   incompetency to assist Federal Habeas counsel.........................7

7            B.    Kelly's mental illness is not in and of itself a sufficient
                   basis for a finding of mental incompetence...............................11

8

9            C.    Kelly's ability to communicate with current counsel
                   through structured questions is a sufficient basis upon
                   which to deny his pending motion..............................................19

10   Conclusion ....................................................................................................................23

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

Page

**CASES**

*Atkins v. Virginia*
(2002) 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 ............................................................. 5

*Bonin v. Vasquez*
999 F.2d 425 (9th Cir. 1993)...................................................................................................... 9

*Brecht v. Abrahamson*
507 U.S. 619, 123 L.Ed.2d 353, 113 S.Ct. 1710 ( 1993) ....................................................... 8, 21

*Calderon v. Thompson*
523 U.S. 538, 118 S.Ct. 1489, 140 L.Ed.2d 728 (1998) ........................................................ 8, 21

*Calderon v. United States District Court (Kelly)*
127 F.3d 782 (9th Cir. 1997)..................................................................................................... 4, 5

*Calderon v. United States District Court*
163 F.3d 530 (9th Cir. 1998)..................................................................................................... 5

*Cooper v. Oklahoma*
517 U.S. 348, 116 S.Ct. 1373, 134 L.Ed.2d 498 (1996) ............................................................ 9

*District Attorney's Office for the Third Judicial District v. Osborne*
___ U.S. ___, 129 S.Ct. 2308 (2009) ........................................................................................ 9

*Hill v. Ayers*
2008 WL 683422 UD Dist Lexis 30799 (ND Cal. 2008) ...................................... 14, 15, 16, 17

*In re Blodgett*
502 U.S. 236, 116 L.Ed. 2d 669, 112 S.Ct. 674 (1992) ............................................................ 22

*Medina v. California*
505 U.S. 437, 112 S.Ct. 2572, 120 L.Ed.2d 353 (1992) ................................................... passim

*Nash v. Ryan*
2009 U.S.App.LEXIS 20284 (9th Cir. 2009)...................................................................... passim

*Nelson v. Campbell*
541 U.S. 637, 124 S.Ct. 2117, 158 L.Ed.2d 924 (2004) ............................................................ 22

*Patterson v. New York*
432 U.S. at 208............................................................................................................................ 8

*People v. Kelly*
1 Cal.4th 495, 822 P.2d 385, 3 Cal.Rptr.2d 677 (1992)........................................................ 2, 3

1

# TABLE OF AUTHORITIES
## (continued)

2

Page

3

*People v. Kelly*
4
   51 Cal.3d 931, 800 P.2d 516, 275 Cal.Rptr. 160 (1990)........................................................ 2, 3

5

*Rohan ex rel. Gates v. Woodford*
   334 F.3d 803 (9th Cir. 2003)............................................................................................... passim

6

*Snyder v. Massachusetts*
7
   291 U.S. 97, 78 L.Ed.2d 674, 54 S.Ct. 330 (1934) ...................................................................... 9

8

**STATUTES**

9

18 United States Code
10
   § 2421(d).......................................................................................................................................... 8
   § 3599(a) (2)..................................................................................................................................... 6

11

21 United States Code
12
   § 848(q)(4)(B) ................................................................................................................................. 6

13

28 United States Code
   § 2254............................................................................................................................................... 8

14

Antiterrorism and Effective Death Penalty Act of 1996 .................................................................... 4

15

California Penal Code
16
   § 187................................................................................................................................................ 2, 3
17
   § 190.2 (a)(3).................................................................................................................................... 3
   § 190.2 (a)(17)(ii).......................................................................................................................... 2, 3
18
   § 261 (2)............................................................................................................................................ 3
   § 664.................................................................................................................................................. 3
19
   § 1368............................................................................................................................................... 8
20
   § 12022.3 (a) .................................................................................................................................... 3
   § 12022.5.......................................................................................................................................... 2, 3

21

22

**CONSTITUTIONAL PROVISIONS**

23

United States Constitution
   Sixth Amendment ............................................................................................................................. 20
24
   Fourteenth Amendment..................................................................................................................... 9

25

26

27

28

(Test Case Number)

1

**PRELIMINARY STATEMENT**

2      Condemned inmate Horace Kelly contends that he is entitled to an indefinite

3   stay of the two federal habeas proceedings before this Court because he is allegedly

4   unable to communicate rationally with his counsel due to suffering from

5   schizophrenia. Kelly has not met his burden of proof of showing that he lacks the

6   ability to understand his position and to rationally communicate with his current

7   counsel. A thorough review of the extensive mental health information pertaining

8   to Kelly shows that malingering is a factor in Kelly's presentation, and that his

9   presentation of symptoms is not consistent with schizophrenia. The inconsistencies

10   in Kelly's mental health history, combined with the evidence of malingering, show

11   that Kelly is willfully misrepresenting the extent of his mental illness because he is

12   sufficiently rational to understand that his behavior is his best defense against being

13   executed. So even though Kelly is clearly mentally ill, and his ability to

14   communicate is affected by his mental illness, Kelly has nevertheless failed to show

15   by a preponderance of the evidence that he lacks the present ability to communicate

16   rationally with current counsel. Kelly cannot refute the evidence showing that he

17   has sufficient control over his symptoms such that he could provide information

18   requested by current counsel in response to concrete questions -- if he were

19   motivated to do so. Kelly has the present ability to provide information about his

20   past, the crimes, or his criminal trial by answering specific questions about whether

21   a specific thing happened, or whether he was told particular information. However,

22   Kelly's anxiety, combined with his lack of incentive to cooperate, sufficiently

23   impairs his communication such that a question from his current counsel that

24   requires a narrative answer from Kelly would be a frustrating and likely futile

25   endeavor. The right to competency that is intended to give meaning to Kelly's

26   statutory right to counsel in the proceedings before this Court, however, does not

27   require that Kelly possess the ability to provide information at the higher level of

28

1  functioning represented by unstructured questioning by his counsel. Accordingly,
2  for the reasons detailed below, Kelly's motion for an indefinite stay of his collateral
3  challenges to his two state court judgments of conviction and sentences of death
4  based on his alleged lack of mental competency should be denied.

## PROCEDURAL BACKGROUND

6  On November 16, 1984, Kelly attempted to rape Sonia Reed before shooting
7  her to death. The next day, Kelly attempted to rape Ursula Houser before shooting
8  her to death. Both murders occurred in San Bernardino County. Later that same
9  month, on Thanksgiving Day, in Riverside County, 13-year-old Shannon P. and her
10  11-year-old cousin, Danny O. walked to the store after Thanksgiving dinner to buy
11  candy. As they walked home, Kelly, wearing a security guard uniform, grabbed
12  Shannon P. around her neck from behind and began dragging her toward his van.
13  When her 11-year-old cousin came to her aid, Kelly shot him. After wounding
14  Danny, Kelly fired another shot at close range striking Danny between the eyes as
15  the boy was pleading with Kelly to spare his life. Police stopped Kelly a few hours
16  later as he drove the van. Kelly was wearing a security guard uniform and was in
17  possession of a .357 magnum revolver he had purchased two months earlier.
18  Kelly's gun had blood on its barrel that matched Danny's blood type and the bullets
19  recovered from the crime scene were conclusively proven to have been fired from
20  Kelly's gun. Following his arrest in Riverside County, Kelly confessed to police on
21  tape to the murders of the two women in San Bernardino County. See, *People v.*
22  *Kelly*, 51 Cal.3d 931, 940-942 [800 P.2d 516, 275 Cal.Rptr. 160] (1990) (*Kelly I*);
23  *People v. Kelly*, 1 Cal.4th 495, 512, 514-515 [822 P.2d 385, 3 Cal.Rptr.2d 677]
24  (1992) (*Kelly II*).

25  In 1986, a Riverside County jury found Kelly guilty of murdering Danny O.
26  (Cal. Penal Code § 187), and further found true two kidnap-murder special
27  circumstance allegations (Cal. Penal Code § 190.2(a)(17)(ii)) and a personal gun-
28  use allegation (Cal. Penal Code § 12022.5). After the penalty phase, the jury

2

1  determined the appropriate punishment was death and the trial court entered a
2  judgment of death. *Kelly I*, 51 Cal.3d at 931.

3      Kelly's trial for capital murder in San Bernardino followed. The criminal
4  proceedings were delayed during trial to litigate Kelly's competency to stand trial.
5  Various court-appointed experts examined Kelly and those experts unanimously
6  concluded that Kelly was mentally competent to stand trial, and the trial court
7  found Kelly competent to stand trial. The jury subsequently found Kelly guilty of
8  murdering Houser and Reed, and of rape, attempted rape, and robbery. Cal. Penal
9  Code §§ 187, 664, 261(2). The jury also found Kelly personally used a firearm in
10  the commission of those offenses and found true two rape-murder and one multiple-
11  murder special circumstance allegations. Cal. Penal Code §§ 12022.5, 12022.3 (a),
12  190.2 (a)(3) & (17)(iii). The jury rejected Kelly's plea of not guilty by reason of
13  insanity, and instead found him to be sane, and returned a death verdict. *Kelly II*, 1
14  Cal.4th at 495.

15      The California Supreme Court affirmed Kelly's Riverside County conviction
16  and death sentence in 1990. *Kelly I*, 51 Cal.3d at 931. Two years later, in the San
17  Bernardino case, the California Supreme Court reduced the rape conviction to
18  attempted rape, reversed the robbery conviction, attendant gun-use enhancement,
19  and robbery-murder special circumstance, and otherwise affirmed the death
20  sentence and judgment of conviction in all other respects . *Kelly II*, 1 Cal.4th at
21  495.

22      In 1992, Kelly requested this Court appoint him counsel and a stay of
23  execution of his Riverside County death sentence. In 1993, Kelly again requested
24  the assistance of this Court with respect to his San Bernardino County death
25  sentence. Pursuant to Kelly's requests, this Court appointed counsel to challenge
26  each of Kelly's judgments of convictions and sentences of death, and issued a stay
27  of execution as to both death sentences.

28

1    On January 6, 1995, this Court ordered an evaluation of Kelly by David
2  Kessler, M.D., to determine whether Kelly lacked the capacity to assist his counsel
3  with pursuing his federal habeas claims. Dr. Kessler examined Kelly and reviewed
4  his history and opined to this Court in a report dated March 21, 1995 that, if it were
5  assumed that Kelly's current presentation was an accurate indicator of his current
6  psychiatric condition, then Kelly was suffering from a psychotic mental disorder so
7  severe that it "precludes his capacity to appreciate his current legal position and
8  make rational choices with respect to the current court proceedings." On April 29,
9  1996, this Court appointed Phyllis Kelly as next friend to Kelly.

10    No habeas petitions were filed with this Court prior to the enactment of the
11  Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). The State pre-
12  emptively obtained a writ of mandate from a three-judge panel of the Ninth Circuit
13  finding that any petitions filed by Kelly would be time barred with the exception of
14  any claims raising his incompetency to be executed. *Calderon v. United States*
15  *District Court (Kelly)*, 127 F.3d 782 (9th Cir. 1997) (*Kelly III*).

16    In 1998, a trial was held in Marin County to determine whether Kelly was
17  legally sane for the purpose of execution.[1] Dr. Sophia Vinogradov, a defense
18  expert retained for the present motion, Dr. Roderick Pettis, an expert appointed by
19  the court, and Drs. Maurice Lyons and Roderick Ponath, members of the staff at
20  San Quentin, all testified that Kelly was not legally sane to be executed. In spite of
21  these expert opinions, a jury concluded that Kelly was competent to be executed.

22    Kelly subsequently filed separate habeas petitions in this Court challenging the
23  Riverside County and San Bernardino County judgments of conviction and
24  sentences of death. Each petition raised a competency to be executed claim among
25  other claims. This Court subsequently granted Kelly equitable tolling. The three-

26    [1] The jury was instructed that Kelly had the burden of proof by a
27  preponderance of the evidence to show that by reason of a mental disease and/or
    mental defect Kelly was unaware of the fact of the impending execution or was
28  unaware of the reason he was being executed.

4

1   judge panel of the Ninth Circuit granted the State's petition for writ of mandate in
2   part, ordering that all but Kelly's claim of mental incompetency to be executed
3   must be dismissed. *Calderon v. United States District Court*, case number 98-
4   70569 (9th Cir. 1998) (*Kelly IV*). The Ninth Circuit granted en banc review, and
5   reversed the decision of the three-judge panel, thereby affirming this Court's grant
6   of equitable tolling. *Calderon v. United States District Court*, 163 F.3d 530 (9th
7   Cir. 1998) (*Kelly V*).

8       On April 1, 1999, Kelly filed amended habeas petitions in this Court in case
9   numbers 92-5420 TJH and 93-2951 TJH. In April of 2003, Kelly filed habeas
10  petitions in the California Supreme Court challenging both the Riverside County
11  and San Bernardino County death sentences, relying on the United States Supreme
12  Court's decision in *Atkins v. Virginia* (2002) 536 U.S. 304, 321, 122 S.Ct. 2242,
13  153 L.Ed.2d 335, in claiming that it would violate the Eight Amendment's
14  proscription on cruel and unusual punishment to execute him because he is
15  allegedly mentally retarded.[2] (California Supreme Court case Nos. S115428 and
16  S115483.) The California Supreme Court issued an order to show cause in both
17  cases, returnable to the Riverside County Superior Court. An evidentiary hearing
18  was conducted from January 23, 2006, through February 1, 2006, on Kelly's mental
19  retardation claim. Dr. Alan Abrams' testified as an expert witness for the state,
20  opin ing that Kelly was not mentally retarded. Dr. Vinogradov was one of the
21  expert witnesses called by Kelly who testified that Kelly was mentally retarded.
22  Following the evidentiary hearing, a Riverside County Superior Court judge found
23  that Kelly had not satisfied his burden of establishing by a preponderance of
24  evidence that he was mentally retarded. On June 2, 2006, Kelly filed a habeas
25  petition in the California Supreme Court, challenging the superior court judge's

26      [2] Before filing in the California Supreme Court, Kelly filed a motion in this
    Court for an evidentiary hearing on the issue of his mental retardation. After
27  Respondent opposed the motion on the ground the *Atkins* claims were unexhausted,
    Kelly withdrew his motions, agreeing that the claims were unexhausted.
28

5

1 *Atkins* finding.  On October 18, 2006, the California Supreme Court denied the

2 petition on the merits.

3     On April 10, 2009, Kelly filed a motion to stay federal habeas proceedings due

4 to his alleged lack of mental competency to assist his current counsel in pursuing

5 federal habeas relief from his Riverside County and San Bernardino County

6 judgments of conviction and sentences of death.  This Court ordered a response to

7 Kelly's motion filed on or before September 25, 2009.

8 <div align="center">**ARGUMENT**</div>

9 **I.   KELLY IS NOT ENTITLED TO A STAY OF FEDERAL HABEAS**

10      **PROCEEDINGS**

11     Kelly contends that he lacks the present ability to consult with his federal

12 habeas counsel with a reasonable degree of rational understanding and does not

13 have a rational, as well as a factual understanding of his habeas proceedings

14 pending before this Court; and as a result, he cannot assist his current counsel with

15 respect to claims in his two pending habeas petitions challenging his final

16 judgments of conviction and sentences of death in Riverside and San Bernardino

17 Counties.  (Mtn. at 18, P.'s & A's at 18.)  Kelly seeks an indefinite stay of his

18 federal habeas proceedings due to his alleged mental incompetency to assist his

19 current counsel in collaterally challenging his convictions and two death sentences.

20 Kelly's motion should be denied because he has failed to sustain his burden of

21 demonstrating that he lacks the ability to rationally communicate with his current

22 counsel such that they will be unable to meaningfully pursue federal habeas relief.

23     The United States Court of Appeals for the Ninth Circuit has concluded that

24 the right to counsel afforded by Congress to inmates challenging state court death

25 judgments (18 U.S.C. § 3599(a) (2), and former 21 U.S.C. § 848(q)(4)(B)) creates

26 an implied statutory right to competence during federal habeas proceedings.  *Rohan*

27 *ex rel. Gates v. Woodford*, 334 F.3d 803, 813 (9th Cir. 2003); see also, *Nash v.*

28 *Ryan*, 2009 U.S.App.LEXIS 20284 (9th Cir. 2009).  "[F]ederal habeas relief in a

1   death penalty case requires that the petitioner possess essentially the same mental

2   capacity that renders him competent to stand trial: the ability to understand and to

3   communicate rationally with counsel when necessary." *Nash*, 2009

4   U.S.App.LEXIS 20284, at \*\*22-23.

## A.   KELLY BEARS THE BURDEN OF PROOF REGARDING MENTAL INCOMPETENCY TO ASSIST FEDERAL HABEAS COUNSEL

7       It is clear that the burden of proof as to mental competency to assist current

8   counsel appropriately rests with Kelly.  Both California and federal law governing

9   mental incompetency of a criminal defendant to stand trial places the burden on the

10  proponent of a claim of mental incompetency, and it would be incongruous to do

11  otherwise in the context of the right to mental competency in the context of federal

12  habeas proceedings.  Further, since due process is not offended by placing the

13  burden of proof of a claim of incompetency on a criminal defendant, it is axiomatic

14  that there is no impediment to placement of the burden on a habeas petitioner

15  collaterally challenging a criminal conviction.  Moreover, Kelly's case aptly

16  illustrates precisely why the burden should be on the proponent of a claim of mental

17  incompetency.

18      Important issues were left unresolved in the Ninth Circuit's decision in *Rohan*,

19  because the incompetency of *Rohan* was assumed on appeal since a prior

20  determination by the district court that *Rohan* was incompetent was never disputed.

21  *Nash*, 2009 U.S.App. LEXIS 20284, at \*22; *Rohan*, 334 F.3d at 819, fn. 11.

22  However, the Ninth Circuit expressly relied on the federal statutory scheme for

23  competency to stand trial in discussing the allocation of the burden of proof in

24  determining whether there has been a sufficient showing to undertake a mental

25  competency determination. *Nash*, 2009 U.S.App. 20284, at \*23.  Accordingly, it is

26  readily apparent that the Ninth Circuit contemplates use of the federal statutory

27  provisions relating to competency to stand trial for guidance in resolving questions

28  relating to determining mental competency for purposes of federal habeas

7

1  proceedings, including the burden of proof for showing a lack of current mental
2  competency. *Id*.

3      Both California and federal law require the proponent of a claim of mental
4  incompetency to stand trial to bear the burden of proving that claim by a
5  preponderance of the evidence. Cal. Pen. Code § 1368; 18 U.S.C. § 2421(d).
6  Inasmuch as Congress did not place the burden on the government to prove a
7  criminal defendant is mentally competent to stand trial (See, 18 U.S.C. § 2421(d), it
8  would be incongruous to imply such a burden on the State with respect to a right to
9  competency to assist federal habeas counsel. This is particularly true when, as here,
10  the right itself is being implied from a statute granting a right to counsel to
11  condemned inmates collaterally challenging a final judgment of conviction by way
12  of federal habeas. In implying legislative intent, i.e., an implied right to
13  competency, it would not be reasonable to infer that Congress intended a greater
14  intrusion upon the State's right to make and enforce its criminal laws than is
15  mandated by the Constitution itself. This is evident from the recognition by
16  Congress of the need to limit the intrusion upon the states from a federal court's
17  exercise of federal habeas jurisdiction. See, 28 U.S.C. § 2254, as amended by
18  AEDPA; see e.g. *Calderon v. Thompson*, 523 U.S. 538, 554-555 [118 S.Ct. 1489,
19  140 L.Ed.2d 728 (1998) ["profound societal costs" makes it necessary to impose
20  "significant limits" on exercise of habeas jurisdiction by federal courts]; *Brecht v.*
21  *Abrahamson*, 507 U.S. 619, 635 [123 L.Ed.2d 353, 113 S.Ct. 1710] ( 1993)
22  [recognizing "enduring respect" for States' interest in finality of convictions that
23  have survived direct review within the state court system].

24      The United States Supreme Court has made clear that it does not offend due
25  process to require a defendant in a criminal trial to bear the burden of proving by a
26  preponderance of the evidence that he or she is mentally incompetent to stand trial.
27  *Medina v. California*, 505 U.S. 437, 451 [112 S.Ct. 2572, 120 L.Ed.2d 353] (1992),
28  citing e.g. *Patterson v. New York*, 432 U.S. at 208 (`Due process does not require

8

1   that every conceivable step be taken, at whatever cost, to eliminate the possibility of

2   convicting an innocent person'); *Snyder v. Massachusetts*, 291 U.S. 97, 105 [78

3   L.Ed.2d 674, 54 S.Ct. 330 (1934) (a state procedure `does not run afoul of the

4   Fourteenth Amendment because another method may seem to our thinking to be

5   fairer or wiser or to give a surer promise of protection to the prisoner at bar'). A

6   due process right in the context of postconviction proceedings is "not parallel to a

7   trial right, but rather must be analyzed in light of the fact that [the convicted

8   inmate] has already been found guilty at a fair trial, and has only a limited interest

9   in postconviction relief. *District Attorney's Office for the Third Judicial District v.*

10  *Osborne*, ___ U.S. ___, 129 S.Ct. 2308, 2320 (2009); see also, *Bonin v. Vasquez*,

11  999 F.2d 425, 429 (9th Cir. 1993) (Due process in a postconviction proceeding does

12  not demand effective assistance by appointed counsel). Accordingly, it is clear that

13  no greater burden should be placed upon the State in the context of Kelly's right to

14  mental competence in federal habeas proceedings than would be required of a

15  defendant asserting incompetency to stand trial in either a California or federal

16  criminal prosecution.

17      Further, a full and fair resolution of the pending proceedings is consistent with

18  Kelly bearing the burden of proof on the question of his mental competency to

19  assist current counsel. As Justice O'Connor explained in her concurring opinion in

20  *Medina*, "placing the burden on the defendant in this limited group of cases was

21  permissible because it provided the defendant with an incentive to cooperate with

22  the information-gathering process necessary to a reliable competency

23  determination." *Cooper v. Oklahoma*, 517 U.S. 348, 355, fn. 6. [116 S.Ct. 1373,

24  134 L.Ed.2d 498] (1996).

25          Notably, Justice O'Conner further observed in *Medina*:

26          "The main concern of the prosecution, of course, is that the defendant

27  will feign incompetence in order to avoid trial. If the burden of proving

28  incompetence rests on the government, a defendant will have less incentive to

9

1  cooperate in psychiatric investigations, because an inconclusive examination will

2  benefit the defense, not the prosecution." *Medina*, 505 U.S. at 455.

3  The concern of the State is no different at this juncture, and the State's

4  entitlement to the limits on this Court's exercise of federal habeas jurisdiction

5  demand that Kelly bear the burden of proof on the question of his alleged inability

6  to rationally assist counsel to the extent necessary to meaningfully pursue his

7  habeas claims. The report prepared in 1995 by Dr. Kessler, the expert appointed to

8  assist this Court in determining whether to proceed with a next friend status, aptly

9  illustrates the reason the burden of proof should be with Kelly on the issue of his

10  mental competency to communicate rationally with his current counsel. In terms of

11  concerns of the State over the obvious incentive of a condemned inmate to

12  malinger, it is notable that Dr. Kessler's opinion was couched in terms of assuming

13  that Kelly's presentation of symptoms was in fact an accurate indicator of his

14  psychiatric condition. Assuming that Kelly was not exaggerating his symptoms,

15  i.e., malingering, then Dr. Kessler opined that Kelly was suffering from a psychotic

16  mental disorder so severe that it "precludes his capacity to appreciate his current

17  legal position and make rational choices with respect to the current court

18  proceedings." Accordingly, while it is clear Kelly is in fact mentally ill, the degree

19  to which Kelly is feigning and exaggerating symptoms of mental illness is

20  adversely affecting the ability of mental health experts to determine whether he is

21  actually mentally incompetent for purposes of the federal habeas proceedings

22  before this Court – which is precisely why the burden of proof on the question of

23  his current mental competency within the meaning of *Rohan* appropriately rests

24  with Kelly.

25

26

27

28

10

**B.   KELLY'S MENTAL ILLNESS IS NOT IN AND OF ITSELF A
SUFFICIENT BASIS FOR A FINDING OF MENTAL
INCOMPETENCE**

Kelly contends he is "entitled to an indefinite stay of federal proceedings"
because he "suffers from severe mental illness, which renders him incapable of
understanding his position and rationally communicating with his counsel." (Mtn.
at 1.)  There is no dispute that Kelly is severely mentally ill.  (See, Abrams' Decl. at
¶¶ 4-5.)  However, it is well established that the presence of mental illness is not a
sufficient basis for demonstrating mental incompetency.

Kelly notes that virtually every mental health expert that has evaluated him
since he has been confined at San Quentin State Prison has determined that he
suffers from mental illness. (Mtn. at 1.)  What Kelly fails to explain is how his
extensive mental health history prior to his confinement on California's death row
fails to disclose his suffering from the severe form of schizophrenia that is the basis
for his claim of mental incompetency to assist current counsel.

Nothing in the records pertaining to Kelly indicate that his mental capacities
have changed significantly since he was found competent to stand trial in 1987.
(Abrams' Decl. at ¶¶ 6, 70.)  Dr. Sheffield's report from 1987 quotes Mr. Kelly as
providing the same double-talk speech pattern, which has become the basis of
Kelly's claim that he has completely lost all rationality since arriving at San
Quentin.  (Abrams' Decl. at ¶ 16.)  Kelly's current retained mental health experts
provide extensive documentation showing that Kelly's behaviors prior to 1987
when he was found competent to stand trial, were very similar to his present
behaviors. They document the gibberish speech and writing, the hoarding of
garbage, Kelly's poor personal hygiene, the inappropriate smiling and laughing, the
pseudo disorientation, the refusal to cooperate with counsel and the refusal to
acknowledge his crimes.  Alan Abrams, M.D., evaluated Kelly's mental
competency in the context of his federal habeas proceedings at the request of the

11

1    State. Dr. Abrams' notes a pattern, i.e., after Kelly arrived in San Quentin, he
2    displayed these symptoms more frequently as the threat of execution become more
3    pressing, and less as the threat of execution abated. (Abrams' Decl. at ¶¶ 33-35,
4    39.) Yet, Kelly fails to explain how he could have the most severe form of
5    schizophrenia ever observed, as some have opined, without addressing the
6    relationship between onset of the illness and his impending execution in 1992, the
7    lack of prominent hallucinations, the lack of a clear first episode, the lack of
8    delusions that are distinguishable from denial of oppressive reality, and the very
9    late onset in life. (Abrams' Decl. at ¶ 66.)

10        Many mental health professionals had extensive time to observe and examine
11   Kelly in the years before he was placed on death row and none found clear
12   schizophrenia or florid psychosis. (Abrams' Decl. at ¶ 67.) A careful review of
13   the mental health records demonstrates that since 1992, clinicians have assumed
14   that Kelly became "floridly psychotic" due to schizophrenia unrelated to the stress
15   of facing execution. The assumption that Kelly must suffer from schizophrenia
16   because he provides incoherent responses most of the time fails to account for the
17   extreme "dementia" and "disorientation" that Kelly demonstrates that is not
18   typically found in schizophrenia, and ignores the times when he offers rational
19   responses. (Abrams' Decl. . at ¶ 67.) Taking into account all aspects of what
20   mental health professionals have observed with Kelly, his "incoherent responses
21   appear to be more the result of severe anxiety than the product of delusional beliefs
22   or the loss of cognitive faculties." (Id.)

23        The more explanatory diagnosis for Kelly's use of approximate answers, his
24   extreme denial of emotionally significant facts in his life, and his
25   noncommunicative speech patterns is Ganser's Syndrome. Kelly regularly provides
26   examiners with absurd or approximate answers to questions, such as giving the
27   wrong date consistently as February when it is not February (unless it is February in
28   which case he states a different month), or saying he is in a school, and not

1  identifying that he is in San Quentin State Prison.   Approximate answers are not
2  seen in schizophrenia or other biologically based mental illnesses.  Approximate
3  answers, i.e., giving answers that indicate the question was fully understood, but
4  answering in an absurd manner, are the hallmark of Ganser's Syndrome.  (Abrams'
5  Decl. at ¶ 68.)

6         Dr. Abrams interviewed Kelly in 2004.  As Dr. Abrams explains:

7         " Mr. Kelly's accounts of where he is, his age, his profession or
8         schooling should be viewed as careless and consciously inaccurate, not
9         delusional or the result of amnesia about his real identity.  These are part of
           Mr. Kelly's avoidance of communicating, particularly with mental health
10        clinicians.  Again, during my 2004 evaluation of Mr. Kelly, when I asked him
11        what he talks about with his attorneys: "like when you go to court what do you
           talk with them about?" Mr. Kelly responded "I think we talk about everything
12        but what we're there for."   Later when I followed up with Mr. Kelly and
13        asked "Do you talk with your attorneys about the crimes you were convicted
           of, the shootings?" Mr. Kelly responded: "No." I asked "Why not?" Mr. Kelly
14        explained: "They already know what happened." Mr. Kelly's comments show
15        he has a clear awareness of his unwillingness and perhaps his difficulties
           communicating in a meaningful manner with his counsel.   They also reflect a
16        degree of insight is at odds with Mr. Kelly's claim that he lacks basic
17        awareness of the world.  I have no doubt that Mr. Kelly fully understands his
           legal position as a condemned inmate fighting for his life.   Mr. Kelly's
18        rambling and non-responsive narrative answers reflect a mixture of conscious
19        control away from communication, and also the biological effects of severe
           anxiety about, among other things, the murders and his execution."
20
21        (Abrams' Decl. at ¶ 74.)

22     Dr. Abrams' observed much of the same exaggeration and voluntary evasion
23  by Kelly that many observers have commented on since his arrest for his capital
24  crimes.  However, he also noticed the contradictions in the records that Kelly is
25  "very sensitive to his environment and the circumstances of observation,
26  examination, and testing." (Abrams' Decl. at ¶ 69.)  For example,  a number of
27  observers reference Kelly's normal conversations, including use of joking and
28

                                    13

1   sarcasm, while others describe him as purposefully evasive and vague, and yet
2   others as incoherent and unresponsive.   Dr. Abrams' identifies a pattern to Kelly's
3   "incoherent" speech, and observes that Kelly's associations appear to be
4   structurally patterned rather than loose.  (*Id.*)

5       Dr. Abrams aptly notes that the voluntary aspects of Kelly's presentation are
6   evident from the contrast between his minimally symptomatic presentation to Dr.
7   Lyons, and his "pseudo-demented" presentation to Dr. Kessler only a few days later
8   in March 1995. As Dr. Abrams' concludes, the contrast suggests Kelly has some
9   degree of control over his presentation, including his ability to communicate.
10  (Abrams' Decl. at ¶ 73.) Dr. Abrams' also addresses the highly relevant issue of
11  motivation noting that Kelly's "current behavior and non-responsive speech is now
12  likely an artifact of conditioning and rewards." He acknowledges that there is "no
13  reward for 'good' behavior in the Criminal Justice System, and more reward
14  (typically more contact, more positive contact, delay of punishment, and better
15  treatment) for acting 'sick.'" It is in this context that Kelly "understands that his
16  best defense is his current behavior." While Dr. Abrams' is not able to quantify the
17  degree to which Kelly is willfully misrepresenting his clinical picture, he notes that
18  Kelly is willfully misrepresenting the extent of his mental illness. (Abrams' Decl.
19  at ¶ 69.)

20      Relying on *Hill v. Ayers*, 2008 WL 683422, 2008 UD Dist Lexis 30799 (ND
21  Cal. 2008), Kelly argues that the opinions of San Quentin mental health
22  professionals, specifically Roy Johnson, Ph.D., Erika Bencich, Ph.D., and David
23  Parecki, Ph.D. reporting that Kelly suffered from delusions have particular
24  significance. Id. at 4-3. While the three staff psychologists are employed by the
25  State, as opposed to Kelly's current or past mental health experts, that does not
26  require that their observations or diagnostic impressions be taken at face value in
27  determining whether Kelly is presently mentally incompetent within the meaning of
28  *Rohan*. The observations of mental health professionals employed by San Quentin

1    cannot serve as a substitute for Kelly failing to reconcile inconsistencies or account

2    for evidence of malingering in claiming to be presently mentally incompetent.

3    Moreover, nothing in the observations and opinions of Drs. Johnson, Bencich, and

4    Parecki compels acceptance of the opinions of the most recent expert opinions

5    obtained by Kelly's current counsel.

6        The first of the three San Quentin staff psychologists relied on by Kelly is Roy

7    Johnson, Ph. D. Dr. Johnson was Kelly's Case Manager at San Quentin in

8    December of 2006. (Petitioner's Exhibit B at p. 191.) Dr. Johnson had previously

9    been Kelly's Case Manager at San Quentin in 2001 or 2002. (*Ibid.*) In the period

10    starting in December 2006, Dr. Johnson saw Kelly on a weekly basis, usually from

11    the front of Kelly's cell. (*Id.*, at p. 192.) Dr. Johnson diagnosed Kelly as having

12    schizophrenia and opined he was severely impaired in the area of communication.

13    (*Id.*, at 194, 201-204.) Johnson observed behaviors in Kelly that were delusional

14    and observed disorganized speech 99% of the time he was observing Kelly. (*Id.*, at

15    201-204, 208.) Dr. Johnson believed there was "a substantial likelihood Kelly

16    would benefit from psychotropic medication." (*Id.*, at 303-304.) Dr. Johnson never

17    saw any evidence that Kelly was malingering and was "95% sure" he was not

18    feigning. (*Id.*, at 305-307.) Dr. Johnson opined Kelly could not communicate

19    rationally with current counsel about any subject relevant to his legal proceedings.

20    (*Id.*, at 309-311.) Dr. Johnson opined that withholding psychotropic medication

21    from a patient with the symptoms displayed by Kelly is a breach of standard of

22    practice for a mental health professional. Dr. Johnson would expect that Kelly's

23    ability to communicate would be improved through the use of medication. (*Id.*, at

24    329-334.)

25        Kelly also relies on the observations of San Quentin staff psychologist Erika

26    Bencich. Dr. Bencich began treating Kelly in February 2007. (Petitioner's Exhibit

27    A at 12.) She saw Kelly approximately 52 to 65 times during the year she treated

28    him. All but one of those contacts were from the front of Kelly's cell. She

1   diagnosed Kelly with schizophrenia, disorganized type. (Id., at 13-14.) About 95%
2   of the time she observed Kelly, he engaged in disorganized speech and was often
3   incoherent. (Id., at 16.) Kelly's General Functioning Score was at 40, meaning he
4   was at the very bottom of the level of functioning which allowed him to be treated
5   in the institution rather than being hospitalized. (Id., at 37-38.) Dr. Bencich found
6   consistently that Kelly is chronically, severely impaired. (Id., at 99.) Dr. Bencich,
7   a long with other San Quentin staff, believe that antipsychotropic medication would
8   be an appropriate treatment for Kelly's mental illness but a court order is currently
9   preventing the use of any medication. (Id., at 100-101.) Dr. Bencich does not
10  believe Kelly is malingering because his behavior and symptoms have remained
11  consistent. (Id., at 102-103.) Dr. Bencich did not believe Kelly was able to
12  rationally or accurately communicate his perceptions, memories or desires. Dr.
13  Bencich did not believe Kelly could respond to open-ended or complex questions.
14  (Id., at 103-107.)

15      The third San Quentin staff psychologist that Kelly relies on is Dr. David
16  Parecki. Dr. Parecki was Kelly's Case Manager beginning in July 2005. Kelly was
17  also assigned to Dr. Parecki's group therapy. (Petitioner's Exhibit C at p. 426.) Dr.
18  Parecki diagnosed Kelly as suffering from schizophrenia, undifferentiated type.
19  (Id., at 429.) Sometimes when he attempted to communicate with Kelly, he would
20  not respond. Other times Kelly's response would be off topic. (Id., at 439.) A
21  great majority of the time Kelly's speech would be impaired and incoherent. (Id., at
22  440.)

23      At a meeting of Kelly's treatment team on March 14, 2006, Dr. Parecki noted
24  Kelly's behavior was confused and ritualistic, his speech was illogical, his
25  intellectual functions were below average, he had loose association of thought and
26  had poor reality of contact. Kelly was given a GAF score of 31, close to requiring
27  hospitalization. (Id., at 493-497.) Dr. Parecki indicated he could effectively
28  communicate with Kelly, in that he could speak to Kelly and Kelly would respond

1  back to him. Dr. Parecki noted a recent contact with Kelly, wherein Kelly
2  recognized him and called him by name. Kelly could give him responses to simple,
3  brief questions but could not express any abstract or complex ideas. (*Id*., at 554-
4  555.) Dr. Parecki characterized Kelly's mental impairment as chronic and severe.
5  (Id., at 574-575.)

6      Dr. Parecki believed that Kelly might benefit from taking antipsychotic
7  medication. (Id., at 574-576.) Dr. Parecki never indicated in the notes in Kelly's
8  file that he believed Kelly was malingering or faking any of his symptoms. (Id., at
9  576-577.) Dr. Parecki did not believe that Kelly could accurately communicate his
10 perceptions, memories or desires. (*Id*., at 577.) Dr. Parecki opined that Kelly
11 might have trouble answering simple, structured, closed questions because some of
12 his answers are bizarre and sometimes he is not able to stay on task for even the
13 most concrete questions. Kelly could not answer complex, abstract or open-ended
14 questions clearly or consistently. Regarding questions related to the crimes for
15 which he was convicted, Dr. Parecki believed that Kelly could not answer such
16 questions accurately or effectively communicate his thoughts or concerns with his
17 current counsel. Kelly could not remember facts related to the crimes and could not
18 rationally communicate with counsel regarding his case. (*Id*., at 579-581.) Dr.
19 Parecki has spoken to psychiatrists at San Quentin that have expressed their belief
20 that Kelly's condition would be helped by his taking anti-psychotic medication.
21 Such medication is a standard treatment for schizophrenia. (Id., at 591-592.) The
22 vast majority of contacts between Dr. Parecki and Kelly were from the front of
23 Kelly's cell which limited Dr. Parecki's ability to effectively communicate with
24 Kelly. (Id., at 581-584.)

25     In contrast to the treatment context in which the three San Quentin staff
26 psychologists have considered Kelly's mental condition, Dr. Abrams', the
27 psychiatrist who has evaluated Kelly at the request of the State regarding the
28 question of mental competency to assist current counsel, has focused on the

17

1     complete mental health history of Kelly which spans decades. In addition to the
2     reports and opinions of the three San Quentin staff psychologists, Dr. Abrams''
3     thorough review of Kelly's extensive mental health history and medical history
4     included all of the medical records regarding Kelly from San Quentin. Dr. Abrams'
5     also reviewed records and statements regarding Kelly's childhood and school
6     records. In addition, in 2004, Dr. Abrams' interviewed Kelly at San Quentin. His
7     interview of Kelly lasted in excess of five hours. Dr. Abrams'' interview of Kelly
8     was video-recorded and the video of the interview is being provided in support of
9     Respondent's Opposition to Petitioner's Motion to Stay Federal Habeas
10    Proceedings Due to Incompetence of Petitioner. Dr. Abrams' has also reviewed
11    declarations from persons who observed Kelly prior to his murdering two women
12    and a child. Dr. Abrams' also has reviewed reports and diagnoses of the myriad of
13    physicians and clinicians who have treated and or evaluated Kelly over the past two
14    decades. His review of materials has included the declarations provided to this
15    Court in support of Kelly's pending motion, i.e., the declarations of Dr. Sophia
16    Vinogradov and attorney Mark Olive.

17       With benefit of reviewing the extensive mental health history of Kelly that
18    spans decades, Dr. Abrams' disagrees with most of the physicians and clinicians
19    who have treated Kelly over the past dozen years. Dr. Abrams' concludes that
20    Kelly suffers from chronic Ganser's Syndrome or "prison psychosis" rather than
21    schizophrenia. (Dr. Abrams' declaration ¶¶ 4, 63-64.) Dr. Abrams' points out that
22    Kelly had never been diagnosed with schizophrenia before 1992, when facing his
23    first execution date, and seemed to recover without treatment after his execution
24    was stayed. (Dr. Abrams' declaration ¶ 23.) Kelly's responses during Dr. Abrams'
25    March 4, 2004, interview demonstrate that Kelly was coherent, he was aware that
26    he was being interviewed and his answers were made in response to Dr. Abrams'
27    questions. Kelly showed no signs of delusions or hallucinations. (Dr. Abrams'
28    declaration ¶ 46.) Kelly's responses to questions posed by Dr. Abrams' was not

1  "word salad" as referred to by other evaluators, but was "structured use of language
2  to avoid communication." (Dr. Abrams' declaration ¶ 47.) Kelly's ability to
3  respond appropriately to the testing conducted by Dr. Abrams' indicate a clear
4  understanding of questions posed to him, at least in response to questions which
5  were concrete and required simple reponses. (Dr. Abrams' declaration ¶ 50.)

6  Dr. Abrams' diagnosis of chronic Ganser's Syndrome is more consistent with
7  observations during Dr. Abrams' interview and not inconsistent with more limited
8  observations made in front of Kelly's cell by staff at San Quentin. Ganser's
9  Syndrome, a phenomena associated with prisoners, has symptoms consistent with
10  the manner in which Kelly presents: appearing to be alert and to understand the
11  questions; giving "an incorrect and often ridiculous reply" to questions;
12  disorientation to place and time; occurring in persons of low or borderline
13  intelligence. (Dr. Abrams' declaration ¶¶ 63-64.) In addition, Kelly displays
14  symptomology inconsistent with schizophrenia. (Dr. Abrams' declaration ¶¶ 65-
15  67.)

16
17
18

**C.  KELLY'S ABILITY TO COMMUNICATE WITH CURRENT COUNSEL THROUGH STRUCTURED QUESTIONS IS A SUFFICIENT BASIS UPON WHICH TO DENY HIS PENDING MOTION**

19  In determining the precise level of the ability to communicate that would
20  ensure Kelly's right to competency in the context of federal habeas proceedings,
21  this Court must balance the rights of the State with Kelly's, guided by the limits on
22  the exercise of federal habeas jurisdiction and its duty to resolve the pending
23  proceedings promptly consistent with giving full and fair consideration to the issues
24  presented. With these considerations in mind, it is clear that Kelly is not entitled to
25  an indefinite stay of these proceedings as he has failed to meet his burden of
26  demonstrating that he lacks the present ability to understand and to communicate in
27  a rational manner with his current counsel when necessary.

28

19

1    Dr. Abrams' directly addresses the issue before the Court as a result of Kelly's
2    motion to indefinitely stay his habeas proceedings, i.e., what is Kelly's present
3    ability to communicate rationally with his counsel. Dr. Abrams' opines, based
4    upon his review of records and his own observations of Kelly, that Kelly is capable
5    of understanding simple sentences, to compose and speak simple communicative
6    sentences, to understand and remember simple instructions and to engage in limited
7    decision making. However, Dr. Abrams' also predicts that there is little likelihood
8    that Kelly will make any attempt to cooperate or communicate with counsel in any
9    rational manner. Dr. Abrams' believes that even if Kelly was willing to try to
10   communicate effectively, only a structured exchange of information could take
11   place through a forced choice methodology, similar to the SSSQ testing engaged in
12   by Kelly. Dr. Abrams' believes that Kelly lacks the capacity to rationally
13   communicate with his attorneys in response to general, unstructured questioning,
14   because he is apparently unable to present information related to any subject in a
15   narrative form. (Dr. Abrams' declaration ¶¶ 71-75.) Accordingly, while Kelly is
16   clearly mentally ill and lacks the present ability to communicate in an unstructured
17   narrative fashion, he has failed to demonstrate he lacks the ability to rationally
18   communicate with current counsel in response to structured questions.

19   Kelly's ability to respond to structured questions of current counsel is
20   sufficient current mental competency within the meaning of *Rohan*. As the Ninth
21   Circuit has acknowledged, a criminal defendant's right not to stand trial while
22   mentally incompetent "certainly does not imply a coordinate requirement on
23   collateral review." *Nash*, 2009 U.S.App.LEXIS 20284, at *8. Accordingly,
24   Kelly's right to assist current counsel in his federal habeas proceedings is solely a
25   statutory right that does not implicate his right to counsel under the Sixth
26   Amendment. *Id.*, at *6, fn. 5.

27   The right to competency implied by the statutory right to counsel rests with
28   the conclusion that "rational communication could still play an important role in a

20

1  habeas proceeding" because a capital petitioner's incompetence could prevent him
2  from "communicating information that he alone possesses." *Nash*, 2009
3  U.S.App.LEXIS 20284, at *8. Observing that "meaningful assistance of counsel
4  is essential to the fair administration of the death penalty and rational
5  communication is essential to meaningful assistance of counsel," the Ninth Circuit
6  concludes that it follows that the Congressional mandate that has provided
7  condemned inmates with counsel in federal habeas proceedings "cannot be
8  faithfully enforced unless courts ensure that a petitioner is competent." *Id*. at *8-9,
9  quoting *Rohan*, 334 F.3d at 813.

10  In determining the precise level of rational communication that satisfies the
11  level of competency required to ensure the "fair administration of the death
12  penalty" within the meaning of *Rohan*, this Court should be guided by the
13  limitations on a federal court's exercise of habeas jurisdiction. As the United States
14  Supreme Court has explained, it is necessary to impose "significant limits" on the
15  discretion of federal courts to grant habeas relief because the exercise of habeas
16  jurisdiction by a federal court entails "profound societal costs." *Calderon v.*
17  *Thompson*, 523 U.S. at 554-555. These limits on the exercise of habeas jurisdiction
18  reflect an "enduring respect" for the interest of states in the finality of convictions
19  that have survived direct review within the state court system. *Id*. at 555; *Brecht v.*
20  *Abrahamson*, 507 U.S. at 635. "Finality is essential to both the retributive and the
21  deterrent functions of criminal law." Thompson, 523 U.S. at 555. Finality
22  enhances the quality of judging and serves to preserve the "federal balance." *Id*.
23  Federal habeas review "frustrates 'both the States' sovereign power to punish
24  offenders and their good faith attempts to honor Constitutional rights.'" *Id*. at pp.
25  555-556. The "power of the State to pass laws means little if the State cannot
26  enforce them." *Id*. at 556.

27  In the context of the death penalty, the United States Supreme Court has
28  recognized the "significant interest" the State retains "in meting out a sentence of

21

1    death in a timely fashion." *Nelson v. Campbell*, 541 U.S. 637, 644 [124 S.Ct. 2117,

2    158 L.Ed.2d 924 (2004). Moreover, in light of the fact this Court has granted a stay

3    of execution as to both of Kelly's death sentences, this Court has a "duty to take all

4    steps necessary to ensure a prompt resolution of the matter, consistent with its duty

5    to give full and fair consideration to all issues presented in the case." *In re*

6    *Blodgett*, 502 U.S. 236, 238 [116 L.Ed. 2d 669, 112 S.Ct. 674 (1992) (per curiam).

7          As the Ninth Circuit has explained, it is not the nature of the proceeding, i.e.,

8    habeas or appeal from the habeas proceeding, that determines the level of

9    competency that is required, but instead "the inquiry should be whether rational

10   communication with the petitioner is essential to counsel's ability to meaningfully"

11   pursue relief on behalf of the petitioner. *Nash*, 2009 U.S.App.LEXIS 20284, at

12   *15.  Inasmuch as habeas counsel has the benefit of extensive records, including

13   Kelly's statements and information he provided to police and to the myriad of

14   mental health professionals who evaluated him, and all the independent sources of

15   information from the trial and appellate proceedings, it is not necessary to the fair

16   administration of the death penalty,  to the full and fair resolution of Kelly's habeas

17   petitions, or to ensuring Kelly's current counsel can meaningfully pursue habeas

18   relief on Kelly's behalf, that Kelly have the present ability to respond to

19   unstructured questions in a narrative fashion.  Any information that must be

20   obtained solely from Kelly at this juncture in the criminal justice process such that

21   meaningful representation by counsel would depend upon obtaining that

22   information from Kelly, can be obtained from Kelly through structured questioning.

23   The only impediment to such questioning is that Kelly understands all too well that

24   his ability to avoid execution rests with exaggerating his symptoms and not

25   communicating with counsel.  Under these circumstances, Kelly cannot sustain his

26   burden of demonstrating mental incompetence within the meaning of *Rohan*.

27

28

                                             22

## CONCLUSION

This Court should deny Kelly's motion as he has failed to sustain his burden of proof of demonstrating his inability to communicate rationally with his current counsel by a preponderance of the evidence.

Dated: September 25, 2009

Respectfully submitted,

EDMUND G. BROWN JR.
Attorney General of California
ANNIE FRASER
Deputy Attorney General
LISE JACOBSON
Deputy Attorney General

***/s/Scott C. Taylor***
SCOTT C. TAYLOR
Deputy Attorney General
*Attorneys for Respondent*

SD1993XW0008
80389958.doc

## CERTIFICATE OF SERVICE

Case Name:   **Kelly v. Wong**                          No.   **93CV2951-TJH**

I hereby certify that on <u>September 25, 2009</u>, I electronically filed the following documents with the Clerk of the Court by using the CM/ECF system:

**OPPOSITION TO PETITIONER'S MOTION TO STAY FEDERAL HABEAS CORPUS PROCEEDINGS DUE TO INCOMPETENCE OF PETITIONER**

I certify that **all** participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

I declare under penalty of perjury under the laws of the State of California the foregoing is true and correct and that this declaration was executed on <u>September 25, 2009</u>, at San Diego, California.

|  |  |
|---|---|
| M. Torres-Lopez | |
| Declarant | Signature |

80390043.doc